Jesus A. MEDINA, et al.,
Plaintiffs–Appellees,

v.

Paul B. O'NEILL, Etc., et al.,
Defendants–Appellants.

Maria Delia GARCIA,
Plaintiff–Appellee,

v.

Paul B. O'NEILL, Etc., et al.,
Defendants–Appellants.

No. 87–2440.

United States Court of Appeals,
Fifth Circuit.

March 4, 1988.

Nanette R. Everson, Sp. Counsel to Asst. Atty. Gen., Civ.Div., Dept. Justice, Washington, D.C., Sam Longoria, Asst. U.S. Atty., Houston, Tex., Michael K. Suarez, for defendants-appellants.

Stefan Presser, ACLU of Pa., Philadelphia, Pa., for Medina et al.

Frumencio Reyes, Jr., Houston, Tex., for Garcia.

Richard Prinz, Houston, Tex., for amicus curiae Am. Immigration Lawyers Ass'n.

Before BROWN, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Stowaways were detained in a private detention facility as excludable aliens. One alien was killed and another injured while attempting to escape. Certain of the aliens sued, claiming both statutory and due process violations. The district court[1] in a careful opinion found that the Immigration and Nationality Act imposed upon the Immigration and Naturalization Service a responsibility for the stowaways' detention but that the statute did not imply a private cause of action. The court also found that the conditions of their detention denied the stowaways due process. The court thus

1. *Medina v. O'Neill,* 589 F.Supp. 1028 (S.D.Tex. 1984).

granted partial summary judgment for the stowaways and awarded one dollar in nominal damages. We are not persuaded that a statutory duty ran from INS to the stowaways or that the agency violated the aliens' constitutional rights. We vacate the finding of a statutory duty. We also conclude that Supreme Court decisions subsequent to the district court's ruling require us to reverse the judgment for the stowaways entered on the district court's finding that furnished detention facilities were constitutionally inadequate.

## I

The vessel Cartagena de Indios entered the Port of Houston in February, 1981. Before docking, the ship's captain notified his shipping agent, the E.S. Bennings Company, in Houston that the crew had discovered twenty-six stowaways on board. The agent immediately contacted INS, whose inspectors boarded the vessel on February 7.

The stowaways proved to be excludable aliens from Columbia.[2] Stowaways usually are detained on board the carrying vessel.[3] However, the vessel lacked the facilities to detain the stowaways[4] and their number posed a danger to the crew. The solution was a decision by Paul O'Neill, District Director of INS, to allow the ship to detain the stowaways off the vessel.

Carl Jensen, an INS Supervisory Criminal Inspector, searched for local detention facilities. The Galena Park Police Department initially agreed to hold twenty stowaways, while the six remaining were held at a facility owned by Danner, Inc., a private security firm. The Galena Park authorities, however, found their facilities to be overcrowded. Jensen met with a Bennings agent and Danner security guards at the Galena Park jail. Ten stowaways then were transported to the Danner facility, joining their six companions.

Two days later, the sixteen Danner stowaways attempted to escape. Danner personnel managed to thwart the effort. However, one of the guards used his shotgun as a "prod," which accidentally discharged, killing Ramón Garcia and wounding Jesus Medina.

Medina and two other stowaways filed suit against O'Neill and Jensen, alleging both statutory and constitutional violations. First, because INS allegedly failed to designate a place of detention while exclusion was pending, the aliens claimed they were deprived of their rights under 8 U.S.C. § 1323(d).[5] Second, because INS failed to oversee their detention, the aliens contended they were subjected to detention conditions that amounted to punishment, violating their Fifth Amendment due process rights.

The district court refused to enter summary judgment for the stowaways for breach of statutory duty despite its finding that § 1323(d) required INS to designate a place of detention. The court found that Congress did not enact the provision for the especial benefit of stowaways but rather to benefit the public by keeping out undesirable aliens.[6] Thus, section 1323(d) did not imply a private cause of action as determined by the standards established by the Supreme Court.[7]

---

**2.** Stowaways are excludable aliens under 8 U.S.C. § 1182(a)(18).

**3.** The vessel must detain the stowaway "on board or at such other place as may be designated by an immigration officer...." 8 U.S.C. § 1323(d). The vessel is responsible for the cost of detention of the excludable alien. 8 U.S.C. § 1227(a).

**4.** [D]eposition testimony establishes that the ship had no spare quarters or holding cells for detention. Instead, the stowaways were locked in several storage holds located in various parts of the ship. The storage holds, not having been designed for human habitation, lacked such necessities such as ventilation, heating, lighting, bedding, toilet facilities, and running water. Many of the stowaways lacked the proper clothing for February weather, for example shirts and jackets. They stuffed newspaper in their clothes to warm themselves.
*Medina,* 589 F.Supp. at 1031 n. 4.

**5.** *See supra* note 3.

**6.** *Medina,* 589 F.Supp. at 1037.

**7.** *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

The district court also found that the aliens' constitutional rights were violated [8] because the conditions in Danner did not meet constitutional standards, and that O'Neill and Jensen had no defense of good faith immunity because these standards were clearly established law.

As we will explain, we disagree that the Immigration Act imposes upon INS a statutory responsibility for stowaways. We also find that INS did not violate Medina's due process rights, according to the standards we recently have articulated.[9] We do not reach the question of immunity.

## II

The district court read the statute as requiring INS, through the Attorney General, to provide appropriate detention facilities for stowaways,[10] and as imposing a duty on INS to designate places of detention for them.[11] The court thus concluded that "Congress contemplated that INS would assume responsibility for detention." [12]

■ The district court pointed out that § 1252(c) requires the Attorney General to provide appropriate places of detention for deportable aliens.[13] While recognizing that the provision only required the Attorney General to provide detention facilities for those aliens awaiting *deportation*, the district court found a duty owed to excludable aliens because "[p]resumably, any INS detention facilities would be used to accommodate both excludable and deportable aliens." [14]

But section 1252(c) directs arrangement of detention facilities "for those aliens whom he shall take into custody and detain *under this section.*" [15] The plain language of the statute limits the Attorney General's duty to deportable aliens. That the same facilities might be used for deportable and excludable aliens cannot alter the differential reach of the statute. The Attorney General's duty to provide appropriate detention facilities for deportable aliens is not fairly read as a statutory duty to excludable aliens.

The Immigration Act separates aliens into two distinct camps—deportable and excludable—and the duties owed to one cannot be assumed to apply to the other. For example, § 1252(b) describes the proceedings required to determine deportability of aliens. Among other procedural protections, the alien must be given reasonable notice of the charges against him, may be represented at his own expense by counsel, and must be given an opportunity to examine and present evidence.[16] In contrast, the Act does not require similar proceedings for excludable aliens.[17] The Supreme Court also has recognized recently that deportation and exclusion proceedings differ significantly.[18]

The district court also found that the INS had a duty under § 1323(d) to designate detention facilities for stowaways because the section requires the vessel to detain the stowaway "on board or at such other place as *may be designated by an immigration officer....*" [19] However, the word "may," as opposed to "shall," *allows* INS to designate such facilities; the statute does not *require* INS to do so. In sum, we find no breach of statutory duty.

---

8. *Medina,* 589 F.Supp. at 1037–42.

9. *Lynch v. Cannatella,* 810 F.2d 1363 (5th Cir. 1987).

10. *Medina,* 589 F.Supp. at 1039.

11. *Id.* at 1037.

12. *Id.* at 1040.

13. "The Attorney General is authorized and directed to arrange for appropriate places of detention for those aliens whom he shall take into custody and detain under this section." 8 U.S.C. § 1252(c).

14. *Medina,* 589 F.Supp. at 1039.

15. 8 U.S.C. § 1252(c) (emphasis added).

16. 8 U.S.C. § 1252(b).

17. 8 U.S.C. § 1226.

18. *See Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982).

19. 8 U.S.C. § 1323(d) (emphasis added).

## III

The district court found that the conditions at Danner failed the constitutional requirements set by *Bell v. Wolfish,* for the conditions of pretrial detention.[20]

We recently discussed the substantive due process rights of excludable aliens in *Lynch v. Cannatella.*[21] In *Lynch* we could conceive of no national interests that would justify "the malicious infliction of cruel treatment"[22] on an excludable alien. Such an alien is entitled "to be free of gross physical abuse at the hands of state or federal officials" under the due process clause.[23] The stowaways alleged neither that cruel treatment was maliciously inflicted upon them nor that they suffered gross physical abuse. They stated no claim for violation of due process rights.

Measured by decisions following the district court's ruling, the district court's application of *Bell* cannot stand. As we recently observed,[24] the Supreme Court has shifted ground since *Bell,* deciding that negligence alone does not trigger due process.[25] "Only if the evidence suggests that the [officials] knew of the jails' conditions, or intended to force the detainees to endure such conditions, would a *Bell* analysis retain validity."[26]

No more than negligence on the part of O'Neill and Jensen is alleged. O'Neill swore, without contradiction, that he never had been to the facility, had no reason to believe it was an inadequate place to detain stowaways, and never had received a complaint about Danner. Agent Jensen also swore, without contradiction, that he never had before placed anybody in Danner's custody and never had received a complaint about the facility. "Such negligence cannot amount to a violation of whatever due process rights these stowaways possessed...."[27]

VACATED IN PART, REVERSED IN PART.

---

**20.** "[I]f a restriction or condition [of pretrial detention] is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).

**21.** 810 F.2d 1363 (5th Cir.1987).

**22.** *Id.* at 1374.

**23.** *Id.*

**24.** *Ortega v. Rowe,* 796 F.2d 765 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987).

**25.** *See Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 671, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986).

**26.** *Ortega,* 796 F.2d at 768.

**27.** *Lynch,* 810 F.2d at 1370.