United States Court of Appeals,

Fifth Circuit.

No. 94-30131.

AMERICAN HOME ASSURANCE COMPANY, Plaintiff,

v.

SLETTER M/V, her engines, tackle, radios, furniture, fixtures, gear, apparel, appurtenances, etc., in rem, et al., and Tweendeck, VI K/S and Karlander Shipping Services A/S, Defendants-Cross-Plaintiffs-Cross-Defendants-Appellees,

v.

BRAZILIAN OVERSEAS SHIPPING SERVICES, LTD., Defendant-Cross-Defendant-Cross-Plaintiff-Appellant.

The West of England Ship Owners Mutual Insurance Association (London) Limited, Movant-Appellant.

Feb. 3, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before SMITH and EMILIO M. GARZA, Circuit Judges, and BERRIGAN, District Judge.[*]

BERRIGAN, District Judge:

The issue in this case is to determine who is responsible—as between a vessel owner or the time charterer of a vessel—for damage to that vessel's cargo caused by stowaways. The District Court determined that the time charterer was solely responsible, absolving the vessel owner of any liability. We affirm.

*Factual and Procedural History*

Tardivat International (NY) Coffee Corporation ("Tardivat") purchased a consignment of coffee to be imported from South America

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

to the United States. Tardivat entered into a charter agreement with Brazilian Overseas Shipping Services, Inc. ("Boss Lines") to transport the coffee cargo. Boss Lines in turn entered into a time charter for the use of the vessel M/V SLETTER, owned by Tweendeck VI K/S ("Tweendeck") and brokered by Karlander Shipping Services A/S ("Karlander").

The vessel was delivered to Santos, Brazil, in proper condition to carry the cargo. The coffee was loaded without incident. The vessel subsequently stopped at Puerto Cabello, Venezuela, to discharge some cargo then travelled on to New Orleans, a trip of well over a week. It is uncontroverted that nine stowaways surreptitiously boarded the ship, apparently at Puerto Cabello. Upon arrival in New Orleans, the stowaways were discovered. Likewise discovered were numerous bags of coffee contaminated by the stowaways' urine and excrement. Some 800-plus bags of coffee had to be destroyed.

American Home Assurance Company ("American Home"), the insurer of the cargo, paid Tardivat for the damage. As the subrogated insurer, American Home in turn sued the charterer Boss Lines, and the owners Tweendeck/Karlander for reimbursement. By consent judgment, the defendants agreed to a total settlement amount of $75,983.17, but could not agree as to which defendant was liable for what portion. The defendants submitted the matter for trial court resolution through affidavits, exhibits and argument.

The trial court concluded that the charterer Boss Lines was solely responsible for the damage to the cargo. The court reasoned

that (1) the charter agreement between Boss Lines and Tweendeck/Karlander placed responsibility for overseeing the cargo operations upon Boss Lines, including the loading and discharging of the cargo; (2) the charter agreement likewise placed the captain of the ship and his crew, employed by the owners, under the orders and direction of Boss Lines; (3) Boss Lines chose the ports of call, which included Puerto Cabello, well known for problems with stowaways; (4) Boss Lines employed the stevedores at each port who had full access to and control of the cargo holds and decks during the loading/discharging of the cargo; and (5) the stowaways had to have been aided in hiding amidst the cargo, that aid most likely rendered by the stevedores employed by Boss Lines. The court found that the captain and crew made every effort at Puerto Cabello to limit access to the ship solely to crewmembers, authorized personnel and individuals identified as stevedores and likewise made a diligent search for possible stowaways prior to leaving port. The court likewise found that the captain supervised the loading operations at Puerto Cabello. The court found no negligence on the part of the captain and crew in these responsibilities, but also concluded that even if they were negligent, their negligence was attributable to Boss Lines since the captain and crew were under the direction of Boss Lines pursuant to the charter agreement.

Boss Lines has appealed, arguing that (1) the trial court erred in ruling that the charter agreement attributed any negligence on the part of the captain in allowing stowaways on

3

board to Boss Lines rather than the vessel owner; (2) the trial court erred in attributing the acts of the stevedores to Boss Lines as Boss Lines contends the stevedores were independent contractors, not Boss Lines' agents and further contends the evidence failed to establish that the stevedores smuggled the stowaways on board; and (3) the trial court erred in admitting an affidavit from the ship captain; Boss Lines asserts the affidavit contained inadmissible hearsay and it was not timely provided to counsel.

We find it only necessary to discuss the first issue, as our decision there renders the other issues moot.

*Discussion*

Preliminary to discussing the substantive issue raised by Boss Lines, we must deal with a dispute as to the nature of the district court proceeding and the standards of review on appeal. Boss Lines implies that the lower court decision was akin to a motion for summary judgment which calls for *de novo* review of all issues; alternatively, Boss Lines characterizes all the disputed issues as matters of law rather than questions of fact, again calling for *de novo* review. Tweendeck/Karlander understandably argues that the lower court decision rested largely on findings of fact that are not to be disturbed unless "clearly erroneous." Rule 52(a) of the Federal Rules of Civil Procedure. We conclude that the interpretation of the charter agreement is subject to *de novo* review as a matter of law but that the trial judge's factual findings are to be upheld unless clearly erroneous.

*The Charter Agreement*

4

Boss Lines asserts that the trial court erred in concluding that any negligence or fault of the captain in preventing the boarding by the stowaways was attributable to the charterers rather than the vessel owners by virtue of the charter agreement. Boss Lines cites *D/S OVE SKOU v. Herbert,* 365 F.2d 341 (5th Cir.1966), *cert. denied,* 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970), and *Woods v. Sammisa Co., Ltd.,* 873 F.2d 842 (5th Cir.1989), *cert. denied,* 493 U.S. 1050, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990), as primary support for its argument. Both of those cases dealt with the same standard charter party agreement that exists in this case and both cases discuss Clause 8, a clause of particular importance to the trial judge here in holding Boss Lines liable for the cargo damage. Clause 8 here states as follows:

> The Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain, who is to sign the Bills of Lading.

The trial court relied on this clause in determining that the vessel and its crew were at all relevant times entirely at the disposal of the charterer Boss Lines. Therefore, even if the captain and crew had somehow been at fault in the stowaways coming on board, that fault was attributable to the charterer and not the vessel owner.

Both *Ove Skou* and *Woods* concerned longshoremen on stevedoring crews who claimed they were injured by conditions on board vessels. In *Ove Skou,* the plaintiff was hurt when he fell into a hatch

5

opening after an allegedly misfit hatch board upended; in *Woods,* the longshoreman was injured when a bundle of pipe, allegedly dangerously stowed at the originating port, swung out and struck him while being unloaded. In both cases, an issue was the effect of Clause 8 on the liability of the time charterer vis-a-vis the vessel owner. We held in *Ove Skou* that Clause 8 did *not* give "any operational control" to the charterers regarding "employment and agency" nor over the "load(ing), stow(ing) and trim(ming)" of the cargo. Rather, Clause 8 was simply a "specification of the party—owner or charterer—upon whom the ultimate financial cost rests for any one or more of the activities." 365 F.2d at 351. In *Woods,* we reaffirmed the holding of *Ove Skou,* again in the context of liability for personal injury to a longshoreman.

This case does not involve injury to a person but rather injury to *cargo,* a distinction that is crucial. Clause 8 has travelled a different jurisprudential route when cargo damage was at issue. In *Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422 (5th Cir.1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969), a vessel load of bananas was damaged primarily because of poor stowage. The vessel owner argued that the charterer was responsible, apparently citing Clause 8 of the charter agreement. We acknowledged that Clause 8 imposes upon the charterer the responsibility of stowing the cargo but concluded that the captain still retained the ultimate discretion and decision regarding that stowage. Significantly, however, we held that in making those decisions, the captain occupies a dual

6

capacity:

> He acts for the shipowner where his stowage decisions are made with regard to the seaworthiness and safety of the vessel; he acts for the cargo owner where his decisions do not affect the seaworthiness or safety of the vessel, but affect the safety of the cargo only.

404 F.2d at 433. No mention was made of *Ove Skou*.[1]

In *Nitram, Inc. v. Cretan Life,* 599 F.2d 1359 (5th Cir.1979), a cargo was damaged due to improper stowage. The time charterer claimed the vessel owner was responsible because the captain acted negligently in supervising the loading of the cargo. The charter agreement included Clause 8. Citing *Horn,* we concluded that even if the Captain was negligent, he was acting on behalf of the charterer at the time since his decision related only to the safety of the cargo and not the seaworthiness or safety of the ship. Again, *Ove Skou* was not mentioned.

In *Woods,* supra, we acknowledged *Horn* and *Nitram* and reconciled them with *Ove Skou* as *Horn/Nitram* involved "questions regarding responsibility for damage to the cargo rather than for injuries to persons covering by the LHWCA ..." 873 F.2d at 857, fte. 18.

Our sister circuit, in a cogent concurring opinion, well explains the distinction between owner and charterer liability for cargo damage as compared to personal injury. *Hayes v. Wilh Wilhelmsen Enterprises, Ltd.,* 818 F.2d 1557 (11th Cir.1987). The opinion includes a helpful history. In the early days of shipping,

---

[1]Under the facts in *Horn,* we concluded that the faulty stowage affected the seaworthiness of the vessel, so the responsibility for the cargo damage was upon the vessel owner.

7

when vessels and cargos were small, the shipowner through his crew loaded and unloaded cargo and was responsible for any damage. With larger ships and heavier cargos, it wasn't practical for the crew to undertake that task, so stevedores came into being.

> Because it was hoped that both the shipowner and time charterer would benefit from the vessel's earnings, the parties apportioned the responsibilities to the cargo by special agreements. Those agreements evolved, in part, into Clause 8. As to how the responsibilities were divided, we look to the often quoted passage from *The Santona,* 152 F. 516, 518 (S.D.N.Y.1907): "The ship is the owner's ship and the master and crew his servants for all details in navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew are the servants of the charterer."

818 F.2d at 1563.

The concurrence opines that Clause 8 was intended to transfer ultimate financial responsibility for cargo damage to time charterers, unless the damage results from *unseaworthiness* of the vessel or intervention by the captain *that affects the seaworthiness and safety of ship.* This obligation is wholly separate and distinct from a claim of indemnity for personal injury to a longshoreman. That sort of claim is not encompassed, contractually or historically, within Clause 8.

> In short, what the *D/S Ove Skou* Court said is that the charterer did not contract in Clause 8 to indemnify the shipowner when a longshoreman has prevailed against the shipowner on a personal injury unseaworthiness claim. It did not repudiate the long recognized division of responsibilities—as between shipowner and charterer—to the cargo, as expressed in *The Santona.*

818 F.2d at 1565.

Before the trial court, Boss Lines argued that the stowaways did render the ship "unseaworthy." They cited no legal authority

nor any facts to support the allegation. The district court rejected the contention, finding that the "mere presence" of the stowaways did not render the vessel unseaworthy. This is a factual finding by the trial court that is not only not "clearly erroneous" but is clearly supported by the record.

Boss Lines also cites *United States v. M.V. ISLA PLAZA,* 1994 W.L. 114825 (S.D.N.Y.), an unpublished district court decision from New York, asserting that it is on all fours with the present case. It is not. In *Isla Plaza,* several stowaways hid in a cargo hold and started a fire, destroying cargo and also damaging the vessel. Of significance is that the claim for *cargo* damage was settled out of court, the terms of which are undisclosed by the opinion. The decision deals only with the suit for damage *to the vessel.* Additionally, the agreement in *Isla Plaza* specifically required the ship owner, not the charterer, to provide gangway and other security for the vessel. Since the litigation was over damage to the vessel and since the shipowner specifically contracted to provide security for its vessel, the charterer was not held responsible.

Finally, Boss Lines argues that the pertinent issue is not who is responsible for damage to cargo, but who is responsible for preventing stowaways from boarding a ship[2]. We do not agree. This

---

[2]Boss Lines contends that this responsibility has traditionally belonged to the shipowner but provides inadequate authority for its proposition. Boss Lines cites *Wilhelmensen,* blithely and irrelevantly analogizing stowaways to ship equipment. *Wilhelmensen* had nothing to do with stowaways but dealt with a longshoreman injured when he slipped on fluid leaking from the cargo doors. Boss Lines also cites a case that

case involves recovery for damage to cargo. While our circuit has not previously dealt with the specific issue of damage caused by stowaways, we see no reason to make a distinction between that and other sources of cargo damage.

The crux of Boss Lines' appeal is that the vessel owners are liable because the cargo damage at issue resulted from the captain and crew of the M/V SLETTER negligently allowing stowaways to successfully board the vessel at Puerto Cabello. Since the captain was supervising the unloading of the cargo at the time of the alleged transgression and since the damage caused by the stowaways was to cargo only and since the stowaways did not affect the seaworthiness or safety of the vessel, any negligence or fault by the captain and crew was attributable to the charterer and not the vessel owner. Consequently, even if Boss Lines' factual allegations were correct with respect to the negligence of the captain and crew, they cannot legally prevail as the captain and crew were acting on their behalf.

Having sustained the district court for the reasons stated above, it is not necessary to determine whether the charterer was also responsible for the actions or negligence of the stevedores. Nor is it necessary to decide whether the affidavit of Captain W.

---

references the Immigration and Nationality Act of 1952, which requires that a vessel owner be responsible for the cost of detaining and transporting a stowaway back to the source country. That is obviously not the issue here. *Medina v. O'Neill,* 589 F.Supp. 1028 (S.D.Tex.1984), *reversed in part, vacated in part,* 838 F.2d 800 (5th Cir.1988).

Toennessen was admissible.[3]

The judgment of the district court is AFFIRMED.

---

[3]Toennessen's affidavit dealt with the steps that he and his crew took to limit access to the ship during the unloading at Puerto Cabello.  Since we have concluded that Boss Lines is liable for the cargo damage even if the captain and crew were negligent, it is unnecessary to pass on the admissibility of the affidavit.